## HUBEL v. DICK.[1]

## SAME v. TUCKER and another.

*(Circuit Court, S. D. New York.   July 16, 1886.)*

1. PATENTS FOR INVENTIONS—MACHINES FOR CUTTING OFF CAPSULES.
      The first claim of reissued letters patent No. 10,437, of January 15, 1884, to Frederick A. Hubel, for a machine for cutting off gelatine capsules, is not infringed by a machine built under letters patent No. 305,867, of September 30, 1884, to William A. Tucker.

2. SAME—REISSUE—SUBCOMBINATIONS—DILIGENCE—INTERVENING RIGHTS.
      Subcombinations, apparent on the face of, but not claimed in, an original patent, by inadvertence or mistake, can be introduced in a reissue if season able application is made therefor; but if application is postponed an unreasonable time, they become abandoned to the public, especially if the equitable rights of other parties have intervened.

3. SAME—ENLARGEMENT BY ADDING ELEMENT.
      Where, after an unreasonable delay, (five years,) a second reissue is applied for, in which another element is added to a combination described in a void claim in the first reissue, such added element making a different, and previously unclaimed, invention, the second reissue is an unwarranted enlargement, and is void.

4. SAME—PRIORITY OF INVENTION—DILIGENCE.
      As between two independent inventors, each claiming priority of invention, the question of reasonable diligence is of prime importance, and if the first inventor postpones for an unreasonable period the practical embodiment of his mental conceptions, and his application for a patent, the consequences of his laches may be fatal.

5. SAME—LACHES IN APPLYING FOR PATENT.
      That laches in applying for a patent, when there were no laches in otherwise perfecting the invention, may compel an inventor to be deprived of his patent, another inventor having meanwhile given the same invention to the public, is probably true.

6. SAME.
      When an inventor of a machine of an important character, who has been diligent in perfecting and reducing his invention to practice, and in attempts

---

[1] Edited by Charles C. Linthicum, Esq., of the Chicago bar.

to bring his machine to the knowledge of the public, has merely paused, before applying for his patent, for a period of 19 months after completing his working drawings, and 10 months after completing his machine, it cannot be said there were such laches as should deprive him of the reward which ordinarily attends priority of invention.

7. SAME—DELAY FOR PRACTICAL EXPERIMENT.

A decision which would compel haste in applying for patents before actual practice had tested the truth of the inventor's theory, and had overcome difficulties in the operation of the mechanism, would be productive of more injury than a decision which, while compelling diligence in perfecting the invention, was indulgent of some delay in seeking the patent-office.

In Equity.

*Frederic H. Betts* and *C. Wyllys Betts,* for plaintiff.

*Josiah P. Fitch, Livingston Gifford,* and *A. G. N. Vermilya,* for defendants.

SHIPMAN, J. The first of these cases is a bill in equity, filed February 26, 1884, to restrain the defendant from the alleged infringement of two letters patent, one being reissued patent No. 10,437, granted to the plaintiff January 15, 1884, and the second, No. 275,-092, granted to Harrison H. Taylor, assignor to the plaintiff, April 3, 1883. Each patent is for a machine for cutting off gelatine capsules. The original Hubel patent was dated February 13, 1877. The first reissue, No. 8,440, was applied for August 17, 1878, and was granted October 1, 1878. The second reissue, and the one in suit, was applied for November 16, 1883.

The second case is a bill in equity, under section 4918 of the Revised Statutes, praying that letters patent to William A. Tucker, No. 305,867, dated September 30, 1884, for an improved gelatine capsule-cutting machine, may be declared void, upon the ground that it is an interfering patent with the previous Taylor patent, No. 275,092, and is for the machine which is therein described, and of which said Taylor was the first and original inventor.

*The Hubel Machine, and Reissue No. 10,437.* Before the date of the application for Hubel's original patent, gelatine capsules were, as a rule, moulded upon a board containing separate mould-pins, and were cut off by hand upon a knife fastened to the table, with its cutting edge looking upwards. Considerable testimony was given in regard to a machine used in 1865 by the defendant for making soft capsules, and which is said to have been furnished for about three months with a cutting device. The knives are said to have been fastened to a stationary circular railway. The moulds were brought over the edges of these knives, and, being rotated by means of cog-wheels, to one of which a crank was attached, the gelatine upon the moulds was cut. I make no finding in regard to the cutting devices upon this machine; for, if they existed, the cutting mechanism seems to me to have been so primitive and uncertain in its results that it could anticipate nothing but a machine of a like method of construc-

tion. The Hubel machine was for cutting off capsules automatically, and was so constructed that a series of mould-pins, placed at regular intervals upon a removable plate, was lifted up between a series of knives, which were moved around the mould-pins.

The following description of the machine is condensed from a description of it which was given by the defendant's expert, Mr. Henry B. Renwick. It consists essentially of a series of moulds or pins, with hemispherical ends, arranged in rows, at regular intervals from each other, and secured in upright positions upon a plate called a "mould-plate." The machine has a series of knives, mounted each upon the lower end of a spring, and arranged similarly to the moulds. Each of the springs is secured to the under side of a cog-wheel, but not in the center of the wheel. These wheels are all in gear with each other, and are all of the same diameter. One of them is provided with a handle secured by a crank to the wheel. When this crank is revolved, all the cog-wheels turn, and so do the knives mounted upon them, with a motion like that of the moon around the earth. The springs on which the knives are mounted serve to press them against the capsules. The way of getting the moulds into proper relation with the knives is by setting the mould-plate so low that the tops of the capsules will be below the knives, and with their tops lying below the spaces between the knives. The moulds and capsules are then lifted up by a rack pinion and lever into these spaces, and are moved horizontally, so as to bring the capsules in contact with the knives.

The defendant was using, when the plaintiff's bill was brought, a machine made like the drawings in the patent which was subsequently granted to William A. Tucker, on September 30, 1884. The defendant insists that sufficient evidence was not given of this use, but, taking the testimony, although scanty, which was offered by the plaintiff in connection with the admissions contained in the various answers, I am satisfied that the Tucker machine was in use by the defendant before and on February 26, 1884.

The following description of the machine is also condensed from Mr. Renwick's description: It has a supporting frame, which carries its working parts. It is provided with a sort of shelf, which can be slid up and down to a short distance, and which rests upon and is carried by a nut, on the periphery of which there is a worm-wheel that is in gear with a screw provided at one end with a crank. By turning this crank the nut may be made to revolve, and consequently to raise or lower the shelf very slowly, and through a short distance. This shelf carries the mould-plate indirectly, through the intervention of another plate upon which the mould-plate rests, and to which it is clamped. This second plate is called the "rotation plate." In order to move it a vertical shaft passes up through the center of the nut which carries the worm-wheel, and this shaft has on its upper end a crank, the crank-pin being vertical, and taking into a hole

bored in the bottom of the rotation plate. The machine has near its top a knife-shelf, capable of vertical motion, which carries a series of circular knives mounted on springs, and arranged at the same intervals apart as the moulds. The shelf and knives are moved up and down by a lever. The mould-plate is introduced by hand at such a level that the trimming line of the capsules is opposite the knives, and is secured to the rotation plate. During this time the knives have been kept out of the way by means of pins and a rod, but are now suffered to spring into position against the capsules by means of a motion of this rod. The shaft upon which the crank and crank-pins are fixed which actuate the rotation plate is set in motion, the plate is rotated, and carries each capsule around the edge of a knife. After the capsules have been cut in two, the knives are shoved downwards by means of the lever, and the chip is, by means of this motion, separated from the capsule.

The original Hubel patent was not drawn by a patent solicitor, and contained but a single claim for the entire machine. It omitted the moulds, and failed to designate the separate patentable features of the invention. Reissue 8,440 was applied for, and contained six claims, as follows:

"(1) In a machine for cutting off capsules, the combination of the series of moulds, *e*, and the rack, pinion, and lever, F, T, H, for the purpose of regulating the length of the capsules, substantially as described. (2) In a machine for cutting off capsules, the combination of the sliding-plate, adapted to hold the series of moulds, and the screw mechanism, L, K, N, for the purpose of forcing the moulds against the knives, substantially as described. (3) In a capsule-cutting machine, a series of rotary cutters, operated by a crank and pinion acting upon pinions, one of which is attached to each of said cutters, substantially as specified. (4) In a capsule-cutting machine, the rotary cutters, driven by gearing, substantially as described, and supported upon spring arms, substantially as and for the purpose set forth. (5) In a machine for cutting off capsules, the combination of the sliding-plates, adapted to hold the moulds of the rack, pinion, and lever, F, T, H, and the screw mechanism, K, L, N, for the purpose of giving both a lateral and vertical motion to the sliding-plates, substantially as described. (6) The plate, R, C, in combination with a series of capsule moulds secured thereto at regular intervals, substantially as and for the purposes set forth."

In a suit between the present parties upon the first reissue, not involving the Tucker machine, Judge WALLACE held that the first five claims were valid, and that the sixth was void, whereupon the present reissue was obtained, having six claims, of which the first and sixth, the only ones alleged to be infringed by the Tucker machine, are as follows:

"(1) In a machine for cutting off capsules, the combination of the series of moulds, *e*, and the rack, pinion, and lever, F, T, H, or their equivalents, substantially as and for the purposes described." "(6) In a capsule-cutting machine, the combination with the supporting frame of a mould-plate, bearing a series of capsule moulds, substantially such as described, secured thereto at regular intervals, and a series of knives arranged at like regular intervals

as said moulds, and adapted to cut the capsules formed thereon, substantially as described."

The first question relates to the infringement of the first claim. In the Hubel machine the removable plate, after the moulds have been dipped in the bath, is placed in the machine at a point where the tops of the capsules are below the spaces between the knives, and is then lifted by the rack, pinion, and lever into these spaces, and to a point where the trimming line of the capsule is opposite the knives. The removable plate of the Tucker machine is not placed below the knives, and then moved upwards, but is inserted by hand at the point where the trimming line of the capsules is opposite the knives. It is true that in this machine, by means of a worm-wheel, screw, and crank, the shelf which carries the mould-plate is given a "slight vertical adjustment," in order to accurately adjust the moulds to the knives," but this movement is not, as in the Hubel machine, for the purpose of carrying the moulds up to the knives. It is rather for the purpose of adjusting the moulds when a new or different length of capsules is to be trimmed. While the worm-gear may be properly said, in certain places and machines, to be an equivalent for the rack, pinion, and lever, it is not in this machine, because, in the language of Mr. Renwick, "the mechanism is a means of adjustment, and not a means of movement." The motion is altogether too slow and too limited to answer the purpose of the rack, pinion, and lever, and is introduced into the machine for a different object. The first claim is not infringed.

The proper construction of the sixth claim is a question upon which the respective parties differ, the defendant insisting that mechanism for rotating the cutters is a necessary element. The draughtsman endeavored to have it include the knives, and their appurtenant mechanism, so related to the moulds, and to rotating mechanism of some sort, that they would cut the capsules upon the moulds, and to exclude the rotating mechanism. The claim, as thus construed, includes a very important part of the invention; for, after everything has been done with respect to the cutting mechanism except to rotate it, the mere mechanism by which either knives or mould-plates are rotated may not be difficult. I do not think that the exclusion of rotating mechanism is very important, for if the claim should be construed to include mechanism for rotating either knives or moulds so constructed as to operate in substantially the same way with the described mechanism, inasmuch as the invention is in effect a primary one, the word "substantially" would "be made to cover differences alike numerous and important." Walk. Pat. § 362. *Railway Co.* v. *Sayles*, 97 U. S. 556.

The question, which is also made, of the validity of the sixth claim, irrespective of its construction, seems to me, in view of the history of the patent, to be the most dangerous question to the plaintiff. The original patent was granted February 13, 1877, and was for the

entire machine, although claims for subcombinations could properly have been granted. It has been held in this circuit that the application for a reissue for subcombinations was seasonably made, and that the first five claims of the reissue, which was granted October 1, 1878, were valid, and that the sixth claim was void. It is now contended by the plaintiff that the sixth claim was supposed by the patentee to be for the combination of the removable plate in a supporting frame, a series of moulds at regular intervals, and a series of cutters, and that, the court having held that the phraseology of the claim did not permit such a construction, the patent was again reissued to narrow the claim so that it should have the construction which was originally intended. The plaintiff's ingenious argument fails to satisfy my mind, in view of the claim itself. If the plaintiff wanted, at the time the first reissue was taken, a claim for a combination of plate moulds and knives, it would have been easy to have used language which would manifestly contain those elements; and if he really supposed at that time that his sixth claim would receive the construction which is now sought for it, the supposition was not an inadvertence or a mistake, but an error of judgment.

The facts are, then, that the original patent patented the whole machine; the first reissue attempted to patent the combination of frame, plate, and moulds, which, for some reason, was held to be void; that the important combination of frame, plate, knives, and moulds, to be used in connection with mechanism by which the knives were to be made to cut the capsules, was left open for more than five years to the public, and became the subject upon which at least two independent inventors made inventions prior to the application for a second reissue. The well-known authorities are to the effect that subcombinations of the separate parts of an entire machine which are apparent on the face of the specification, but were omitted to be claimed in the original patent by inadvertence or mistake, can be introduced in a reissue, if seasonable application is made therefor; but, if application is postponed for an unreasonable time, they become abandoned to the public, especially if the equitable rights of other parties have intervened. *Miller* v. *Brass Co.*, 104 U. S. 350; *Mathews* v. *Machine Co.*, 105 U. S. 54; *Gage* v. *Herring*, 107 U. S. 640; S. C. 2 Sup. Ct. Rep. 819.

But it is said that the sixth claim of the second reissue is narrower than the corresponding claim of the first reissue, and therefore it is not within the scope of the cases which have been cited. It is, in a certain sense, a narrower claim, inasmuch as it contains a larger number of elements; but it describes a different invention. The claim is not a different mode of describing that which was specified in the first reissue, and is not a limitation and narrowing of the invention which was described therein, but it describes an independent and important invention, and thereby, after a lapse of five years, the patent was enlarged. The principles in regard to the invalidity

of reissues, when unreasonably delayed, have become so well established that they cannot be successfully avoided by adding, after an unreasonable delay, in a second reissue, another element to a combination described in a void claim in the first reissue, the last added element making a different, and previously unclaimed, invention.

*The Taylor Patent.* The entire history of the Taylor and Tucker patents shows that the first claim of the Taylor patent is infringed by the Tucker machine, and that the only question in the case is in regard to priority of invention by the respective inventors. After Taylor's patent had been granted, Tucker filed his application, on July 20, 1883. Thereupon an interference was ordered, the examiner saying that the count was a single one, and was found substantially in the first claim of each party, and was as follows:

"The combination of a plate with round cutters, secured firmly by their shanks, and a second plate carrying mould-pins held stationary thereon, and mechanism, substantially as described, to move the latter plate, and cause the mould-pins to describe circles around the cutters."

By the board of examiners the interference was decided in favor of Tucker; on appeal to the commissioner of patents, was withdrawn September 8, 1884; and a patent was granted September 30, 1884. Thereupon the defendant Dick set up said decision, and the issuing of said patent, by supplemental answer. The plaintiff, because there was a question whether, after an interference and decision by the patent-office upon the question of priority of invention between two interfering patents, the owner of one of the patents was not estopped from contesting the question of priority in a bill for infringement against the owner of the other patent, each being a party or privy to the judgment of the patent-office, brought a bill in equity against Tucker and Dick, he being the exclusive licensee of said Tucker, under section 4918, to determine the question of priority; and also filed a supplemental bill in *Hubel* v. *Dick*, setting up the above-recited facts, and praying for the benefit in that suit of any decree in *Hubel* v. *Dick and Tucker*. To this supplemental bill the defendant demurred, pleaded the patent-office decision, and answered.

There was nothing objectionable in the general purport and object of the supplemental bill. It became, if not necessary, at least proper, by reason of the facts in the supplemental answer. If I had heard the demurrer at the time it was filed I think that I should have caused the bill to be amended by striking out the allegations in regard to the novelty and utility of the inventions which had already been set out in the bill, because the defendant is unnecessarily called upon to answer again those allegations, and the supplemental bill seems to renew the issue already made, instead of confining itself to the supplemental matter. But the testimony which was taken under the supplemental bill was very limited, and the only testimony upon the subject of priority was taken under the *Hubel* v. *Tucker and Dick* suit. As the danger which the defendant desired to avoid by the

demurrer did not arise, it seems best to overrule the demurrer, without costs.

*The Hubel v. Tucker and Dick Suit.* The testimony in regard to priority was brief. It consisted, on the part of the plaintiff, of proof of the Taylor patent, which, upon its face, is the elder one, and of proof that the first claim of each patent was for the same invention. The defendants offered the proceedings in the patent-office upon the declaration of interference, which resulted in a finding of facts, and a decision by the examiners in chief in favor of Tucker. The evidence of importance was the finding of facts upon which the decision of the examiners was based, so that the question is truly stated by the plaintiff to be, was the decision of the patent-office correct upon its face?

The board of appeals found that Taylor conceived the invention in January, 1882, applied for his patent March 23, 1882, which was issued April 3, 1883; that Tucker conceived the invention in November, 1880; made drawings in January, 1881; commenced to make working drawings for a machine by October 1, 1881, which was completed in December, 1881. A machine was ordered July 5, 1882, was built in August, 1882, and put into successful operation in September, 1882. He applied for his patent July 20, 1883. Tucker first conceived of the invention, and, with reasonable diligence, reduced it to practice before the publication of Taylor's patent.

The fundamental principle in regard to priority as between two independent inventors was early announced by Judge STORY, as follows:

"He who invents first shall have the prior right, if he is using reasonable diligence in adapting and perfecting the same, although the second inventor has, in fact, first perfected the same, and reduced the same to practice in a positive form." *Reed* v. *Cutter*, 1 Story, 590.

Thus, the question of reasonable diligence is of prime importance, and if the first inventor postpones for an unreasonable period the practical embodiment of his mental conceptions, and his application for a patent, the consequences of his laches may be fatal.

Judge INGERSOLL, in *Ellithorp* v. *Robertson*, 4 Blatchf. 307, clearly announced the law upon the subject of priority between a prior patentee and the one who first invented, but who was guilty of laches both in reducing his invention to practice and in applying for his patent, as follows:

"To defeat a patent which has been issued, it is not enough that some one, before the patentee, conceived the idea of effecting what the patentee accomplished. To constitute such a prior invention as will avoid a patent that has been granted, it must be made to appear that some one, before the patentee, not only conceived the idea of doing what the patentee has done, but also reduced his idea to practice, and embodied it in some practical and useful form. The idea must have been carried into practical operation. The making of drawings of conceived ideas is not such an embodiment of such conceived

ideas in a practical and useful form as will defeat a patent which has been granted."

So, also, in *Draper* v. *Potomska Mills Co.*, 13 O. G. 276, Judge SHIPLEY says:

"Illustrated drawings of conceived ideas do not constitute invention, and unless they are followed up by seasonable observance of the patent laws, they can have no effect upon a subsequently granted patent to another. But a patentee whose patent is assailed upon the ground of want of novelty may show, by sketches and drawings, the date of his inceptive invention, and if he has exercised reasonable diligence in perfecting and adapting it, and applying for his patent, its protection will be carried back to such date."

The question, therefore, is, should the first inventor, who proceeded with reasonable diligence to perfect an important invention, and who produced a successful machine before the junior inventor's patent was issued, lose his right to the fruit of his invention on account of the delay which he exhibited in applying for his patent? That laches merely in applying for a patent, when there were no laches in otherwise perfecting the invention, may compel an inventor to be deprived of his patent, another inventor having meanwhile given the same invention to the public, is probably true. The remarks of Acting Commissioner Duncan in *Monce* v. *Adams*, 1 O. G. 2, are important and valuable upon this point. In the case under consideration the utmost time during which the inventor may be chargeable with laches was 19 months,—the interval between the completion of his working drawings and his application for a patent. Ten months elapsed after the completion of the machine. When an inventor of a machine of the important character of either Tucker's or Taylor's, who has been diligent in perfecting and reducing his invention to practice, and in attempts to bring his machine to the knowledge of the public, has merely paused, before applying for his patent, for a period of 19 months after he completed his working drawings, and 10 months after he completed his machine, I cannot say that there were such laches as should deprive him of the reward which ordinarily attends priority of invention. Our inventors are more apt, I suppose, to go into the patent-office with incomplete inventions than to wait too long after experiment has achieved perfection. A decision which should compel haste in applying for patents before actual practice had tested the truth of the inventor's theory, and had overcome difficulties in the operation of the mechanism, would, I think, be productive of more injury than a decision which, while compelling diligence in perfecting the invention, was indulgent of some delay in seeking the patent-office.

The decision of Mr. Justice MATTHEWS in *Detroit Lubricator Co.* v. *Renchard*, 9 Fed. Rep. 293, which was much relied upon by the plaintiff, is not applicable to the facts in this case. In that case the defendant's drawing antedated the patentee's application, and seemed to exhibit a perfect machine in all its parts. "Nevertheless it is

clearly proven that the defendants did not, in fact, construct an indicator in this form, and reduce it to actual use, until after it had been successfully accomplished by Parshall, nor until after the date of his patent. The mere drawing, therefore, cannot be allowed to have the effect of depriving Parshall of his title of being the first and original inventor."

In this case Tucker was diligent in perfecting his invention, and it was given to the public before the date of Taylor's patent.

Let each bill be dismissed.