See, also (D. C.) 46 F.(2d) 355.

## NATIONAL PIGMENTS & CHEMICAL CO. v. SHREVEPORT CHEMICAL CO. et al.

### No. 367.

District Court, W. D. Louisiana, Shreveport Division.

Aug. 22, 1932.

J. G. Palmer, of Shreveport, La., A. C. Paul, of Minneapolis, Minn., and John H. Bruninga, of St. Louis, Mo., for plaintiff.

Ben E. Coleman, of Shreveport, La., Linton, Kellogg & Smith, of Washington, D. C., and Exby, Moriarty & Pierce, of Memphis, Tenn., for defendants.

DAWKINS, District Judge.

This is a suit for direct and contributory infringement of letters patent No. 1,575,945, covering an improvement in the application of mud-laden fluids to oil and gas wells, alleged to have been invented by one Ben K. Stroud, whose rights thereunder are now claimed by the plaintiff as assignee. The petition charges that the infringement consists in the manufacture, sale, and offering for sale mud bases and mud heaviers, and the combinations and ingredients thereof, made according to and embodying the invention contained in said patent, particularly barium sulphate; that the product manufactured, sold, and used by the defendants, known as "mudwate," is in all respects identical with and intended for the same purpose as that covered by said patent. The prayer is for an injunction, profits, damages, and general equitable relief.

Defendants moved for separate trials and for bills of particulars. While these motions were pending an amended bill was filed, wherein the allegations of the original petition were reiterated, and it was further charged that the J. M. Supply Company was "one of the authorized distributors and

agents" for mudwate, manufactured and sold by the other defendants.

Responding to the motion for a bill of particulars, plaintiff answered that it would rely upon all twenty-one claims of the patent, and that the composition of the said mudwate was as follows:

```
"Barium Sulphate ...........................  84.98%
 Silica ....................................   9.15%
 Alumina ...................................    .65%
 Iron-Sesqui-Oxide .........................   3.93%"
```

And that the physical analysis screen test was:

```
"On 100 Mesh Screen                      .008%
 On 200 through 100 Mesh screen         1.61 %
 On 300   "      200    "     "        93.652%
                                      ─────────
                                      100.00 %" (?)
```

Defendants answered separately, denying that Stroud was the first original inventor of "any new and useful improvement or invention in the application of mud-laden fluids to oil and gas wells," and otherwise denied the allegations of the petition. They further averred that the patent was invalid for the reason that the alleged improvement or invention was in public use for more than two years prior to the application for said patent; that the matter covered by the patent did not constitute invention, but was common knowledge to those skilled in the prior art; and finally, that while the application for patent was pending, the applicant therefor so limited and confined the claims of his application under the requirements of the Commissioner of Patents, that he cannot now be allowed a construction broad enough to cover any composition made, used, or sold by defendant.

Later defendants filed a joint amended answer, in which all of the denials contained in the original answer were reiterated. They admitted that the "mud base and mud heavier, and the components and ingredients thereof, manufactured and sold by defendants, are actually used and employed by oil drillers and operators, vendees of defendants, their agents, distributors and purchasers of mud-laden fluids for oil or gas wells and for increasing the specific gravity of mud-laden fluids and for employment in the process of boring and controlling oil and gas wells," but denied that they were used or employed as described in said patent. Further, defendants averred that the plaintiff was estopped by proceedings in the Patent Office, wherein Stroud, the alleged inventor, acquiesced in rulings and objections of the Commissioner of Patents, limiting the scope of said patent; that the claims of the patent were without novelty; and that the said patent was further invalid because of anticipation by the German patents, Stockfisch No. 257,682, issued December 12, 1908, and No. 279,947, issued Nov. 2, 1914. Defendants further alleged invalidity because of prior use and publication as follows: "As an additional or separate defense, Defendants allege that said alleged Letters Patent, No. 1,575,945, and each and every of the claims thereof, is and are invalid and void for the reason that mud bases and mud heaviers, substantially the same, or the same in all material parts or functions, had been or were well known or in common use more than two (2) years prior to said alleged application for said alleged Letters Patent and prior to the alleged invention by said Stroud; that in view of the art at the time of the alleged invention thereof by said Stroud, the same did not involve invention, but only the mere skill and adaptation of the ordinary mechanic skilled in the art; that each and all of the purposes, combinations and parts thereof were well known expedients in said art, and the said alleged invention did not, in law or fact, require more than ordinary skill of the mechanic in said art at said time."

Further, that the application for amendment of the alleged patent, filed by Stroud on December 17, 1924, was "improperly presented as a continuation * * * of the application filed on the 6th day of April, 1923, and obtained on the 9th day of March, 1926," and was therefore void; that the said Stroud surreptitiously and unjustly obtained said letters patent from the true inventors and discoverers thereof, F. P. Shayes, H. T. Lodge, and C. F. Forbes, and that, if valid, the said patent belonged to the state of Louisiana, by whom the said Stroud was employed at the time for the express purpose of working out a solution of the difficulties which the alleged patent was intended to meet, all of which were well known to the plaintiff.

And finally, defendants further averred as follows: "For a further, additional or separate answer to said amended bill of complaint, defendants aver that said Letters Patent No. 1,575,945, and each and every of the claims thereof, is and are invalid and void for the reason that the said Ben K. Stroud did in the month of March, 1922, prepare and publish 'Technical Paper #1, Mud Laden Fluids and Tables on Specific Gravities and Collapsing Pressures' as Supervisor Mineral Division of the Department of Conservation of the State of Louisi-

ana; that by such publication of said Technical Paper #1, advising the public to use the same he was performing the duties of his office and the public immediately upon the publication of said bulletin began using the alleged invention and have continued without interruption the use of said invention to the present time; that during all the time after the publication of said bulletin or technical paper, and while in the employ of the State of Louisiana as Supervisor of the Mineral Division of the Department of Conservation, the said Ben K. Stroud continued to advise the public to use the alleged invention and made no application to the United States Patent Office for a patent thereon; that no application for Letters Patent was filed for said alleged invention until several months after the said Ben K. Stroud had left the employ of the State of Louisiana, and that upon application having been made by the said Ben K. Stroud, he immediately transferred and assigned the alleged invention and the application for patent thereon, to the plaintiff herein. That by such acts of the said Ben K. Stroud while in the employ of the State of Louisiana, the said Ben K. Stroud dedicated and abandoned to the public the said alleged invention; that at the time of the transfer and assignment of said alleged invention to the plaintiff herein, said plaintiff herein had actual knowledge of such dedication and abandonment of said alleged invention by the said Ben K. Stroud to the public."

The issues have been narrowed by admissions and answers to interrogatories under equity rule 58. They are substantially as stated by counsel for defendants in the ".clusion," of their brief, as follows:

(1) Does the patent in the suit, under the doctrine of Carbice Corporation of America v. American Patents Development Corporation, 283 U. S. 27, 51 St. Ct. 334, 75 L. Ed. 819, constitute an attempt to monopolize "a well-known, unpatented article"?

(2) Must the patent be given an effective filing date as of December 17, 1924, instead of April 6, 1923, with the result that it was anticipated by the use of iron oxide in the well known as Sandidge No. 1, on April 27, 1922, and the publication of Technical Paper No. 1 in March, 1922?

(3) Was the patent in suit anticipated by Stockfisch patent No. 279,947?

(4) Was Stroud the original, first, and sole inventor of that which is disclosed and claimed by the patent?

(5) Is the patent void because the subject-matter thereof was abandoned and dedicated to the public, or for the further reason that it is the property of the state of Louisiana?

(6) Even if the patent is valid, has any infringement been shown?

Plaintiff contends that its patent involves two aspects: (1) "That of a mud-laden fluid for oil or gas wells, comprising or including a base or mud-weighting material of high specific gravity"; and (2) that of an "art or process of boring or controlling oil or gas wells by the employment of such a base or weighting material."

▉ I find the facts to be substantially as follows:

Prior to the year 1921, much difficulty had been experienced in the control of oil and gas wells, particularly in those areas where the pressure was great and the formation of the earth was such that the strata near the surface were porous. Many wells had escaped control and gone wild, some of them being ignited by friction or otherwise, and creating craters or miniature volcanoes, particularly in the Monroe gas field. This problem had for years given great concern to the gas and oil fraternity, state conservation departments, and the federal government. About that time, 1921, the Governor of the state of Louisiana, after a survey in this state by two experts from the Federal Bureau of Mines, Bell and Catell, and upon their recommendation, employed the patentee in this suit, Ben K. Stroud, and placed him in charge of the minerals division of the department of conservation, for the express purpose of studying and working out, if possible, a solution of the matter. Up to that time the practice had been to use as a drilling fluid, water mixed with clay or mud produced at the well, but its weight or specific gravity was such that in the high-pressure areas the gas could not be held back during drilling operations, and would cut through the drilling fluid, force its way to the surface or into the porous upper strata, with the results above mentioned. Stroud began a study of various elements, including lead, mercury, cement, and iron oxide. There is dispute in the evidence as to who first suggested the use of iron oxide. It is contended by defendants that Shayes, an employee of the department under Stroud, first actually used it at the suggestion of one Bowles. Shayes was sent to Monroe, La., by Stroud to conduct experiments with various materials. Prior to this, however, Stroud had conducted

experiments, as stated, with mercury, lead, and iron oxide, having purchased some of the latter element in Shreveport and found that it mixed well with clay and water and had less tendency to increase viscosity as the specific gravity of the fluid increased. Its use was demonstrated successfully in controlling Sandidge well No. 1 in the Monroe field, about April 27, 1922. It appears that iron oxide used in the latter instance was purchased in Monroe by Shayes, but I believe this was after it had been, suggested and experimented with by Stroud in Shreveport, and its qualities at least partially developed. Of course the recollections of men, after the long lapse of time involved in this case, are necessarily uncertain, but the time of the suggestion by Stroud of iron oxide and its use in controlling wells, I think, are rather definitely fixed by the testimony of an apparently disinterested witness, Gerald M. Ponton, who says that he discussed its use with Stroud prior to the obtaining of the permit for drilling of the well known as "Pine Woods No. 2," which permit is dated September 6, 1921, and the same was used in this well. I think it reasonably certain that this was before Shayes went to Monroe to conduct his experiments at the direction of Stroud, and during which visit he and Bowles claim that the latter first suggested the use of iron oxide. Such records are much more reliable than memory. My conclusion on this part of the case is, therefore, that the idea was Stroud's, and Shayes was nothing more than the instrumentality through which it was carried out in the experiments in the Monroe field, particularly Sandidge well No. 1.

During the early part of 1922, Stroud carried on correspondence, as supervisor of the minerals division of the Louisiana department of conservation, with various concerns, including Geo. S. Mepham & Co., which finally resulted in the furnishing of barium sulphate or barites, ground to a fineness, such as would permit it to go through a 300 mesh screen. This is the chief substance which is used, both under the patent of complainant and by the defendants in this case. I am convinced that Stroud was the first and true discoverer of the availability of this substance as a weighting material in drilling oil and gas wells. Such assistance as he may have received through this correspondence, would, in my view, amount to nothing more than his having consulted textbooks or other well-known sources for information. He was the first to apply it successfully to the controlling of gas and oil wells. In March, 1922, there was published by the department of conservation of the state, a document entitled "Technical Paper No. 1," of which Stroud was the author, wherein reference was made to the use of iron oxide and other substances for the controlling of gas and oil wells, and in which suggestions were made to the trade for that purpose.

The application for the first patent, Stroud No. 1,575,944, was filed on April 6, 1923, and the application for the second, No. 1,579,545, was made December 17, 1924. Both were finally issued on the same date, to wit, March 9, 1926.

It should be borne in mind that it is only the latter patent as to which the charge of infringement, both directly and by contribution, is made, and, as above stated, plaintiff claims for it two phases, i. e., a mud-laden fluid, having a specific gravity substantially in excess of that of clay-laden fluids, whose viscosity remains such as to permit it to be readily pumped, that will remain in suspension, not settle out or become gas cut, will float the cuttings to the surface and permit them to settle out in basins, that is slimy and serves as a lubricant for the bit, will not erode the bore hole or casing, and because of its slimy nature has wall building properties which seal up the sides of the well, preventing seepage of fluids or gas in the process of drilling; and second, a process for the introduction of this same mud-laden fluid into the well in drilling operations, so as to accomplish the purposes for which it is intended. Barites is specifically claimed as an element entering into the composition of this mud-laden fluid, and in the specifications it is stated that it may easily be ground to a fineness, permitting it to pass through an 800 mesh screen. It is also pointed out that its white color permits the first appearance of oil to be readily discovered. The specifications further suggest the use of iron oxide ($Fe_2O_3$) and an oxide of lead ($PbO$). The process consists in the mixing of any one of these three substances with mud at the well in such proportions as may be found necessary, according to conditions to be dealt with, and applying it through the method used in pumping ordinary clay-laden fluids in controlling gas and oil wells. This patent is stated on its face to be a continuation of the preceding one (1,575,944) issued to the same patentee. In the latter, the claims mention the use of mercury, barium sulphate, iron oxide, and lead concentrate.

It is contended by defendants that the original application for the earlier patent discloses the use of iron oxide, barium sulphate, mercury, and lead concentrate as a compound, composed of all these elements, and does not disclose the use of either one separately. It is true that in the specifications it is stated that: "It is another prime object of the invention to provide an improved compound, consisting of iron oxide, barium sulphate, lead concentrate and mercury or quicksilver, for effectively controlling the flow of oil and gas wells in a well, etc.," but as finally approved and allowed, it was disclosed in claim No. 1 of the first patent, that mercury alone could be used as a base of a mud-laden fluid, in claim No. 2, mercury and lead concentrate were mentioned, and in claims 5, 6, and 7, iron oxide is also separately named as a mud base. Barites was not included specifically for the reason that, as therein stated, it was claimed in the patent in suit, based upon the application for the latter, although "the subject matter disclosed herein (Patent No. 1,575,944) is also broadly claimed." It might be that although all these ingredients are named conjunctively in the original application for the first patent, except the last, quicksilver, it would be apparent to one skilled in the art of well drilling and familiar with the purposes of each, that the word "and" should be read as having the meaning of "or," or a disjunctive, as is sometimes the case in the construction of statutes and contracts. There is much force in the argument of counsel for the plaintiff that this would be true from the fact that each of the elements within itself is a compound, except mercury, which is a liquid, and if iron oxide and barites were combined, the former being red and the latter white, it would serve to prevent the ready recognition of oil in the drilling fluid, claimed to be possible by the use of barites. In any event, this issue involves in considerable measure a question of fact, as to which the conclusion reached by the Examiner, in the absence of clear error, creates at least a prima facie case of validity of the patent, and casts the burden upon the defendants to overcome it by evidence of experts or those skilled in the particular art. No such evidence was offered by the defendants, and I am therefore impressed that the ruling of the Patent Office on the point must stand. Western & Atlantic R. R. v. Henderson et al., 279 U. S. 639, 49 S. Ct. 445, 73 L. Ed. 884; Butterworth v. United States ex rel. Hoe, 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed.

656; In re Demarest (Cust. & Pat. App.) 38 F.(2d) 895.

If the patent in suit was correctly allowed, as a continuation of the former one to the same patentee (No. 1,575,944), then the plaintiff is entitled to the benefits of the filing date of the original application, April 6, 1923, when considering the alleged disclosures of Technical Paper No. 1, in March, 1922, and the control of Sandidge No. 1, April 27, 1922. This I believe to be the case, and hence it becomes unnecessary to consider either of these disclosures under the limitation period of two years. The former, however, will be referred to later when dealing with the claim of abandonment made by the defendants.

I shall now take up the defense relied upon in the conclusion of defendants' brief set forth above.

Unlike Carbice Corporation of America v. American Patents Development Corporation, 283 U. S. 27, 51 S. Ct. 334, 75 L. Ed. 819, commonly referred to in the briefs as the "Dry Ice Case," the present plaintiff is not suing for contributory infringement based upon dealings by the defendants with the former's licensees. The complaint is that the defendants are preparing and selling a product called "Mudwate," which in all essentials is identical with that covered by the patent in suit, including the use of barites, specially ground, and iron oxide, prepared as taught by its specifications and claims, to be used under the identical process and for the self-same purpose, and in addition thereto, are guilty of contributory infringement by its sale to others for use in the same way, all in violation of the rights of the patentee. The Dry Ice case turned mainly upon the point that the plaintiff, by contract or notice, had attempted to restrict the use of a substance or material in common use for years and unpatentable, to wit, solid carbon dioxide, in connection with a patented package or carton (which was afterwards held invalid) in violation of statutory provisions. In other words, plaintiff in that case did not stand upon and confine itself to the protection afforded by the patent, but attempted to widen the scope of its monopoly by contract or notice beyond that which is permitted by the patent laws (it charged nothing for the carton or package, but sought to make its profit out of the sale of solid carbon dioxide). I find, therefore, no analogy between the two cases, but the present one is more nearly akin to that of Leeds & Catlin

Co. v. Victor Talking Machine Co., 213 U. S. 323, 29 S. Ct. 495, 53 L. Ed. 805, and cases therein cited. The barites in the present case is specially prepared by being ground to a fineness which gives it qualities permitting suspension, which, added to its heavy weight, accomplishes the purpose intended, and at the same time produces, when mixed with clays at the well, a slimy product which acts as a lubricant and also serves to seal or close up the pores in the strata from which gas, water, or other substances might flow into the bore hole, thereby permitting a new and useful improvement over the prior art in controlling gas and oil wells. It therefore becomes one of the essential, if not the principal element in the accomplishment of the desired purpose, just as was the record or disc in the talking machine case.

Point No. 2, as to the alleged filing date of the application for the second patent, and the effect thereon of Technical Paper No. 1, and the drilling of Sandidge well No. 1, has already been covered.

The third point is the claimed anticipation of the Stockfisch patent No. 279,947. Although this patent is relied on, it refers to the previous one by the same patentee, No. 257,682, wherein, according to my interpretation, the prime purpose was to line or coat "the inside of wells or bore holes with concrete, without previous encasing or timbering, or by utilizing the column of liquid of high specific weight which fills the well" after it had been sunk. I think this is indicated in the second paragraph of the specifications of the first Stockfisch patent, wherein it is stated that the usual drilling fluid "is replaced by a pressure fluid, which contains solid particles adapted to form concrete so as to produce, after lowering the shell, in conjunction with the cement fed subsequently in a special way, a coating of concrete for the well." On the other hand, the later patent, No. 279,947, relied on as anticipation, seems to embrace an application of the same materials to a like purpose in the process of drilling wells, as will be seen from the first paragraph, where it is stated: "The same pressure fluid (described in the first patent) however, may advantageously be used even during the very operation of sinking the shaft or the well, respectively, particularly in those locations where quicksand and other strata are encountered which harbor the danger of cave-ins." But in each instance the apparent prime object is to seal or strengthen the walls of the shaft or bore hole to prevent cave-ins, and the float-ing off of débris by the same fluid is only incidental to its return to the surface for the further introduction of concrete forming particles. The added weight and pressure produced by this concrete forming material was to force it into the soft spots in the bore holes for wall building purposes alone, whereas in the plaintiff's patent, the prime purpose was to control the high pressure of gas (in particular) and other substances having a tendency to force themselves to the surface through the column of ordinary drilling fluid, with the consequences mentioned earlier in this opinion. Stockfisch maintains his concrete forming materials in suspension by agitation and utilizes their weight to force the composition into the soft formation, while Stroud grinds his barites to a fineness which produces a paste-like substance of high gravity, but which from its physical properties is maintained in suspension and serves as a weighting material to hold down gas and oil pressures. In the one instance Stockfisch had in mind the maintaining of an open hole, by preventing cave-ins, while Stroud's purpose was the controlling and holding back of the substances, oil or gas, for which the drilling operations were being carried on, in such manner as to subject them to the will and necessities, under given circumstances, of the operator, but mainly to prevent loss of the well or its control through blow-outs. In the nature of things, the substances which Stockfisch described are intended, ultimately at least, to settle into solid concrete in the well, and it is common knowledge that the use of ordinary clay, as found at the well, would not serve this purpose if mixed with cement, but would tend to destroy the hardening properties of the elements described by Stockfisch. Then too, his weighting material is necessarily abrasive or non-slimy, and could not, therefore, act as a lubricant upon the drill bit. As previously stated, the function of the fluid in removing the cuttings, appears only incidental and to have been the same as that of any other drilling fluid theretofore in use, and for this reason no particular stress was laid thereon. There is not the slightest suggestion anywhere in either of the Stockfisch patents that he was attempting to meet the serious problem which confronted the industry at the time of Stroud's invention, i. e., the control of high pressure, but was simply endeavoring to provide a protection against soft formations, such as quicksand, that might fill up the hole before the casing had been placed therein, or to aid in setting the casing and relieve

pressure against it after it had been set. Stockfisch's second patent also involved hanger pipes and two-way pumping of his fluid, which are not found in Stroud's. Stockfisch also used the weight and agitation of his concrete forming material to force the wall-building properties into the weak spots in the bore holes, while Stroud contemplates the application of a plaster like substance, composed of barites of iron oxide with clay to the sides of the hole. It is true that the Stroud patent includes only well-known elements, but they are combined in a novel manner, specially prepared, to perform a new and useful function, which I do not believe had been theretofore known or used, and for a purpose entirely different from that of Stockfisch, and in a manner which I believe amounts to invention over the prior art.

The fourth point is as to whether Stroud was the true and original inventor and has been disposed of in his favor earlier in this opinion.

As to the fifth heading, which alleges abandonment and dedication, and secondly, that the patent, if valid, is the property of the state of Louisiana. In support of the first contention under this head, defendants rely upon Technical Paper No. 1 and certain communications between Stroud and Lodge of the Mepham Company, letters to E. C. Pratt and others, written by Stroud to the commissioner of conservation of Louisiana.

I do not believe that the evidence in this case supports the plea of abandonment or dedication. Neither Technical Paper No. 1 nor the correspondence shows a clear purpose on the part of Stroud to abandon or dedicate the subject-matter of this patent. At the time they were written, it was still in the course of investigation and experimentation, and what he appears to have been doing was to encourage the use of the suggested materials to determine their availability for the purposes which he had in mind. In order to constitute either abandonment or dedication, intention to do so must be clear and beyond reasonable doubt, if the application for the patent is made within the statutory period of two years. Ide v. Trorlicht, Duncker & Renard Carpet Co. (C. C. A.) 115 F. 137; Agawam Woolen Co. v. Jordan, 7 Wall. (74 U. S.) 583, 19 L. Ed. 177; Mast, Foos & Co. v. Dempster Mill Mfg. Co. (C. C. A.) 82 F. 327; Hubel v. Dick et al. (C. C.) 28 F. 132. See, also, Diamond Power Specialty Corp. v. Bayer (C. C. A.) 13 F.(2d) 337.

The fact that Stroud was employed by the state did not prevent his obtaining a patent upon his invention. In any event, the state alone could complain, and not these defendants. Dubilier Condenser Corporation v. Radio Corporation of America (D. C.) 34 F.(2d) 450; Hazeltine Corporation et al. v. Electric Service Engineering Corporation (D. C.) 18 F.(2d) 662; Yablick v. Protecto Safety Appliance Corporation (C. C. A.) 21 F.(2d) 885.

As to the sixth point, I think the record clearly shows infringement, both direct and contributory. There should, therefore, be judgment for the plaintiff, adjudging defendants to be infringers, and enjoining them from further infringement. A master will be appointed to ascertain the profits and determine the damages.

Proper decree should be presented.