## NATIONAL PIGMENTS & CHEMICAL CO. v. MID-CONTINENT MUD CO. et al.

### No. 530.

District Court, S. D. Texas, Houston Division.

March 6, 1934.

John H. Bruninga, of St. Louis, Mo., and Frank C. Jones, of Houston, Tex., for complainant.

King, Wood & Morrow, Sam Holliday and Andrews, Streetman, Logue & Mobley, all of Houston, Tex., for respondents.

ATWELL, District Judge.

Complainant is the owner of a patent secured by Stroud for the controlling of troublesome gas which frequently appears in the drilling of oil and gas wells. The fluid not only controls and subjugates the gas, but acts as a lubricant and a strengthener of the walls of the well.

The court always approaches the solution of a controversy of this sort with tender care, since in one case he denies to the public the use of a certain article, or in the other case he denies to an alleged inventor the legitimate fruit of his thought and experience. In view of the decision of Judge Dawkins (National Pigments & Chemical Co. v. Shreveport Chemical Co. (D. C.) 1 F. Supp. 417), which the court has considered not only upon the facts therein recited, but also with reference to the authorities, I think it unnecessary to repeat what he has so well set forth. I do not find either in the purpose of the Stockfisch patent or in the operation thereof, if, as has been suggested, it may be operative, and I do not mean to say by that that it cannot be operated, that there is any anticipation of the Stroud proclamation. Unmistakably, Mr. Stockfisch depended upon agitation for his suspension, and unmistakably he was advising how to fashion a concrete-formed wall, and unmistakably his column fluid was to prevent caving. The difficulty that I found in reading that patent is as to its applicability to the second situation which he discovered and whether or not cuttings were in his mind, and what should become of them; then, too, whether it is persuasive to others or not, the claim, as narrow as we may find it to be, that was recognized by the same patent authorities in Germany, at least to that extent finds no anticipation by Stockfisch as against Stroud, because that office recognized Mr. Stroud's discovery. It is quite true, probably, that the acute mind, the studious mind, fine in logic, and almost undefined in its ability to go into things, may probably appropriately conclude that what that office granted to Mr. Stroud was a suspensoid of the character which he claimed to have discovered. With reference to that particular matter, I am not at all sure that we do any violence to the claim of Mr. Stroud when we concede, as must be conceded, that theoretically his substance barytes may not be a true scientific or physical suspensoid, but I believe the testimony justifies the court in finding that it is a practical suspensoid. I mean by "practical suspensoid" a material that may be used by the driller which is so like that which is found in the clay as to become somewhat of a union with it; and, sec-

ondly, perhaps if it were fine enough, it might operate alone, that is, if it were fine enough to make a mud. I would not like to say that it would not operate alone. But we do not have to go that far because at all times and in all places he puts it with a mud. However, as I have already indicated, I think that while Judge Dawkins is not as critical, probably, with reference to that as the learning displayed here by counsel on both sides has forced the court into becoming, I do believe that his conclusion is sound, that is, that the Stockfisch, as I have already said, was not an anticipation of the Stroud.

█ I have had a little more trouble with prior uses. We must bear in mind, of course, that such anticipatory uses as render invalid a patent must be clear and satisfactory beyond any reasonable doubt. I am not sure that that is the exact language of the decisions, but that is it in substance as I recall it. Of course, a reasonable doubt means a doubt based on reason. It means if one were called upon to act upon such certainty of proof that that one would act in his own most serious private affairs. It does not mean proof to a mathematical certainty nor proof beyond the possibility of a mistake. It merely means that crystallizing of the mind that hears that would warrant that mind and drive that mind to act with reference to that mind's own, as I have already said, most serious private affairs. Here testimony has been offered of a number of witnesses respecting four wells, the Wymple No. 5, the Richardson No. 1, the Tex-La on Pine Island, and, I believe, Richardson No. 2. I may have gotten away from it just for a moment, and extending the first two wells along in 1905 or 1906, the last two in 1914; those dates are substantially correct. Then there seems to have been interims under the proof between 1905 and 1906, and 1914, and between 1914 and the trouble which the Governor of Louisiana discovered and which trouble was resulting in a loss of the natural resources of the state of Louisiana, and the loss was so great that an asserted conservation policy was adopted by that state, in so far at any rate as calling into play those who might know and from such knowledge seek to prevent such losses, I say even giving the testimony of these gentlemen its fullest effect, that is the result of it. But now if we engage in a slightly more critical attitude toward that testimony, an attitude which is wholly judicial and wholly impersonal, we must say that the element of human memory, as displayed in the detail of the particulars of the alleged transaction, is so big that neither of them exposes to the court the use of a process there which can be said in law to have been a use such as Stroud afterwards gave to the world. It is unnecessary, I think, to go into particulars with reference to it, but I can't see a man pounding rock with the crude implements and the differentiated methods that the witnesses bring here to the stand in such a successful way as to anticipate what Stroud discovered.

Attention is called to the Barbed Wire Patent Case, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154, in which Mr. Justice Brown suggests that in view of the unsatisfactory character of oral testimony touching anticipations, arising from forgetfulness, liability to mistake, proneness to recollect things for the party calling, not to speak of the temptation to actually misstate, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt. See, also, the language of Chief Justice Taft in Eibel Process Case, 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523, as well as Deering v. Winona Harvester Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153.

A complete answer, I think, to the situation is and was that even the samples from Louisiana that were brought to the laboratory and which samples are in bottles in court, some of which were ground, according to the testimony, and some of which were beaten with hammers, show upon examination that the bottles that were said to have been beaten with hammers exhibit particles now that clink against the glass and show the largeness of the size and so forth. So that the best that can be said, if we construct out of the testimony of those men a sufficient basis, which I am not sure can be done, but assuming that we can do it, the best that can be said is that what they used in there, while some of it was dust, was rocks, pieces of rocks, some of considerable size, and that they killed the wells. The impossibility of doing what was said to be done afterwards with that same fluid, and that same mud, and those same rocks as a drilling fluid which came up and deposited, and went back down through the wells over and over again, that is doing what Stroud's patent claims his fluid will do, I think is wholly out of the question. It wasn't used for that purpose. It did not accomplish that purpose. Some of it went

642

in one way and some of it in another way. Some of it was used as rope was used and as sacks were used, and as cement was used, and so forth; some of it was used after thirty or forty days of trouble with the well, and so forth. I do not find, therefore, that there is that clear satisfaction and firm basis in the alleged prior uses of a mud-heavying substance such as may be said in law to have anticipated to the extent of invalidating the patent here under scrutiny.

I cannot say that another criticism that the defendant has levelled at the Stroud patent is not well taken. I say, I cannot say that that criticism is not well taken. One of the witnesses presented by the defendant is of strong mentality, and I think his reasoning with reference to some of these allegations especially in the specifications and purposes of the patent are good criticisms, but I think they are superfine. They may be termed in all good scholarship as somewhat hypercritical. The man constructed here or the genie constructed here for the accomplishment of the needed accomplishment must be taken as a whole. We may differ as to the dimensions of his toenail or how long he can hold his breath, but that he is a successful genie is beyond controversy. It is sold to the trade. The trade has been using it. It is successful. The trade needed it. And I believe that is the big thing when one enters this field.

It is true, while we are thinking right along that line, this particular part of the patent, or of a patent, we will say, is addressed to the skillful in the art, but also it is for the purpose of offering something new and how to use it, and the more skillful the reader, the more quickly he will discover its uses, and the burning brightness of his brain should not be used to destroy that which was born and which he now sees, but which in his strength he might find some other use for. The point is, is it workable, is it usable, is it useful, is it new?

I have not gone through hypercritically all of the claims, counsel for the plaintiff, but I think we picked them out pretty well, and if plaintiff is satisfied with them, the court is.

The court therefore directs a decree for the complainant as to claims 7, 8, 9, 10, 12, 13, 15, and 16, of patent number 1,595,945.

The decree should be an interlocutory one with a reference to a master for the ascertainment of damages.